RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0083A (6th Cir.)
File Name: 01a0083a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

MEDICAL MUTUAL OF OHIO,
    *Plaintiff-Appellee,*

    *v.*

DENISE deSOTO; JOSE
deSOTO,
    *Defendants-Appellants.*

Nos. 99-3988;
00-3571

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 98-01328—Paul R. Matia, Chief District Judge.

Argued: September 21, 2000

Decided and Filed: March 27, 2001

Before: MERRITT, KENNEDY, and GILMAN, Circuit
Judges.

———————————

**COUNSEL**

**ARGUED:** Robert Eddy, GALLAGHER, SHARP, FULTON
& NORMAN, Cleveland, Ohio, for Appellants. Stephen F.
Gladstone, FRANTZ WARD LLP, Cleveland, Ohio, for
Appellee. **ON BRIEF:** Robert Eddy, Janice Aitken,
GALLAGHER, SHARP, FULTON & NORMAN, Cleveland,

1

Ohio, for Appellants. Stephen F. Gladstone, Michael J. Holleran, FRANTZ WARD LLP, Cleveland, Ohio, for Appellee. Mary M. Utterback, THELEN, REID & PRIEST, Washington, D.C., Curtis A. Cole, THELEN, REID & PRIEST, Los Angeles, California, for Amicus Curiae.

KENNEDY, J., delivered the opinion of the court, in which MERRITT, J., joined. GILMAN, J. (pp. 22-25), delivered a separate concurring opinion.

---

## AMENDED OPINION

---

KENNEDY, Circuit Judge. This Employee Retirement Insurance and Security Act (ERISA) action comes before the court on the consolidated appeals of defendants, Denise deSoto and Jose deSoto, from (1) the district court's grant of summary judgment in favor of Medical Mutual of Ohio (MMO) finding the deSotos liable for unpaid reimbursement funds due under MMO's welfare benefit plan and (2) its judgment awarding MMO attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1). On appeal, the deSotos assert the district court had no personal jurisdiction over them; MMO was not entitled to reimbursement for the benefits it provided Mrs. deSoto; and California law, in particular section 3333.1 of the California Civil Code, applies to any claim that MMO might have for reimbursement and prohibits it from recovering the medical expenses it paid on Mrs. deSoto's behalf arising from the alleged medical malpractice.[1]

Because we agree that California law governs the contract between Mrs. deSoto and MMO and prohibits MMO from recovering the medical expenses it paid on behalf of Mrs.

---

[1] While MMO paid other medical expenses as well, for the remainder of this opinion we will refer to the medical expenses incurred as a result of the alleged medical malpractice as "the medical expenses."

deSoto, we reverse the district court's grant of summary judgment in favor of MMO and remand with instructions to enter summary judgment in favor of the deSotos. We also vacate the court's judgment awarding attorneys' fees in light of this opinion.

## I.  FACTS

This case presents a unique set of circumstances. Unlike most benefit recovery cases involving group insurance policies, in which the insurance company's suit is premised upon the contract between the company and the insured's employer or organization, *see* LEE R. RUSS, 1 COUCH ON INSURANCE § 7:1 (3d ed. 1997), MMO appears to premise its suit upon the Certificate issued to Mrs. deSoto. "The Certificates issued under the [Cleveland Growth Associations's Counsel of Smaller Enterprises] contract are employee welfare benefit plans governed by [ERISA]." Appellee's Br. at 4. "The Plan Certificates that form the basis for the parties' contractual obligations, and thus govern this lawsuit, provide as follows." *Id*. at 14. Thus, the reader of this opinion should keep in mind that our analysis is based upon MMO's representation that the Certificates control its relationship with Mrs. deSoto.

MMO is a mutual insurance company incorporated under the laws of Ohio. As such, it provides group health insurance plans--governed by ERISA--for member companies of the Greater Cleveland Growth Associations's Counsel of Smaller Enterprises. Under that arrangement, the employees of member companies are eligible to become participants in MMO's welfare benefit plan. To become a participant, an eligible employee must apply and be approved for coverage. The employee receives a Certificate, which, according to MMO's brief on appeal, constitutes the plan and governs the relationship between the MMO and the employee.

The factual circumstances giving rise to this litigation began on December 13, 1993, when Mrs. deSoto underwent

surgery at the University of California's Irvine Medical Center in connection with injuries she sustained from an automobile accident. Pursuant to the terms of the Certificate, MMO paid for Mrs. deSoto's medical expenses incurred because of that accident, including the costs associated with her surgery. As a result of mistakes made during that surgery, Mrs. deSoto was left in a coma and required additional medical attention, thereby incurring additional medical expenses. MMO paid these medical expenses as well. In total, MMO paid $616,537.53 on behalf of Mrs. deSoto.

In an effort to recover some of the damages caused by the mistakes made during surgery, the deSotos filed a law suit against the Regents of the University of California Medical Center in the Superior Court of the State of California for Orange County. The court entered a default judgment against the Regents and awarded the deSotos $9,000,000 in damages. Of that amount, the court designated $1,536,531.00 as past medical expenses.

The Regents attacked the judgment, and in particular the award of medical expenses, filing a motion to vacate the default judgment and grant a new trial, and appealing the judgment as excessive. Soon after the Regents filed their appeal, Mrs. deSoto, through her guardian, Mr. deSoto, negotiated a settlement agreement with the Regents providing for an initial lump sum payment of $2,100,000 and an additional $15,000.00 per month to increase at 3% per year for Mrs. deSoto's life. The settlement characterized the payments as "damages on account of personal injury within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended." That characterization, the Regents and deSotos believed, represented their intent to exclude from their settlement any award of medical expenses.

Believing that the deSotos' recovery entitled it to reimbursement for the medical expenses irrespective of how the recovery was characterized, MMO contacted the deSotos and requested that they reimburse it $616,537.53. The

deSotos establishes that the real party in interest in this suit is the Board of Regents rather than Denise and Jose deSoto. Because the Board of Regents is an agent of the State of California and acts like a corporation, the deSotos have not shown that appearing in Ohio was unduly burdensome or offended "traditional notions of fair play and substantial justice." In other circumstances, however, I might reach a different result under the due process test for personal jurisdiction.

For the reasons stated above, I believe that defendants who are being sued under federal statutes that have a nationwide service of process provision should have the right to raise a due process defense regarding personal jurisdiction over them. The court's national-contacts test, in my view, does not sufficiently protect individual liberty interests under circumstances where the inconvenience of the forum rises to the level of a deprivation of the defendants' constitutional rights. Because I conclude that we have jurisdiction over the deSotos even under the due process test, however, I join the court in its judgment on the merits of this case.

*National Bank*, 657 F.2d 816 (6th Cir. 1981), applying a national contacts test where the statute in question contained a national service of process provision, mandate that we apply such a test here." The jurisdictional statutes involved in both those cases specify a much closer nexus of the defendant to the forum in question than exists in the present case. *See United Liberty*, 985 F.2d at 1330 (setting forth the restrictive service provision in a suit brought against defendants in a securities action); *Haile*, 657 F.2d at 825-26 (finding jurisdiction appropriate in one forum over multiple properties in a receivership action.)

The courts that have found a national minimum-contacts test insufficient to guarantee due process for personal jurisdiction have recognized that it is only in rare instances that the defendant will meet his or her burden of proving a constitutional violation. *See BCCI Holdings*, 119 F.3d at 947 ("We emphasize that it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern."); *Peay*, 205 F.3d at 1212-13. In *Peay*, the court listed a number of factors that a court should consider, including the extent of the defendant's contacts with the place where the action was filed and the inconvenience to the defendant. *See Peay*, 205 F.3d at 1212. Additional factors that should be considered when calculating the inconvenience to the defendant are the defendant's access to counsel, the distance from where the defendant is located to where the action was brought, judicial economy, the probable situs of discovery proceedings, and the nature of the regulated activity in question. *See id.*

I would hold that this circuit should adopt the due process test of the Tenth and Eleventh Circuits in order to guarantee that a defendant's rights are not violated when being haled into court under a federal statute that has a nationwide service of process provision. Turning specifically to the deSotos, however, I would agree that they have failed to establish that defending their case in Ohio has violated their rights. The indemnity provision in the settlement agreement between the Board of Regents of the University of California and the

deSotos disagreed with MMO's assessment of the situation and refused to pay, arguing that under the terms of the Certificate, MMO was not entitled to reimbursement. And even if the Certificate entitled MMO to recover the medical expenses, they protested, California's insurance law prohibited it from obtaining any recovery. Believing it and the deSotos were at an impasse, MMO filed suit in the District Court for the Northern District of Ohio. Upon completing discovery, both parties moved for summary judgment. After finding that it had jurisdiction, the district court agreed with MMO. It ruled that ERISA common law entitled MMO to reimbursement; found that Ohio law rather than California law applied to the plan; held that ERISA common law rather than Ohio law governed the issue; and directed the deSotos to pay MMO $616,537.53.[2] The deSotos appeal that judgment.

Based on that judgment, MMO moved for attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1). The district court, applying the five part-test set forth in *Labor v. King*, 775 F.2d 666 (6th Cir. 1985), determined that MMO was entitled to attorneys' fees and awarded it $57,735.70 in fees and $223.20 in costs. The deSotos appeal that judgment as well.

The consolidated appeals are now before this court.

---

[2]As noted above, the $616,537.53 MMO requested was the total amount of medical expenses MMO paid on behalf of Mrs. deSoto--that is, the expenses resulting from the automobile accident and from the alleged medical malpractice. It appears, however, that the deSotos recovery related only to the injuries sustained as a result of the alleged medical malpractice. The district court and MMO glossed over this point. Unless the deSotos have recovered the medical expenses related to the automobile accident, MMO is not entitled to reimbursement for those expenses. There is no allegation with respect to any recovery except for the alleged medical malpractice.

## II.  DISCUSSION

We review a district court's grant of summary judgment de novo. *See Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 832 (6th Cir. 1999).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### A.  Personal Jurisdiction

As with every case, we begin with any jurisdictional issues. The district court determined that § 1132(e)(2) of ERISA provided it with the authority to exercise jurisdiction over the deSotos since the plan was administered in Ohio.  Section 1132(e)(2) provides,

> Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district court where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

29 U.S.C. § 1132(e)(2).  That section, the court ruled, alters the personal jurisdiction calculus established by *International Shoe Co. v. Washington*, 326 U.S. 310 (1945).  Rather than asking whether the defendant has sufficient minimum contacts with the forum state for the exercise of jurisdiction to comport with traditional notions of fair play and substantial justice, as courts do when relying on a state's long-arm statute to establish territorial jurisdiction, a court should ask whether the defendant has sufficient minimum contacts with the United States.  Because the deSotos had sufficient minimum contacts with the United States, the court concluded its exercise of jurisdiction over them comported with traditional notions of fair play and substantial justice.

*Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).  Because the language and policies behind the Due Process Clause of the Fourteenth Amendment are essentially the same as those behind the Due Process Clause of the Fifth Amendment, the test for fairness in exercising personal jurisdiction over a defendant should be the same for both.  *See BCCI Holdings*, 119 F.3d at 944.

In the seminal case on personal jurisdiction, *International Shoe Co.*, 326 U.S. at 316, the Supreme Court held that due process requires that "the maintenance of the suit . . . not offend 'traditional notions of fair play and substantial justice.'"  Again in the context of the Fourteenth Amendment, the Court has held that due process acts as the "guarantor against inconvenient litigation." *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 292 (1980).

Like the Eleventh Circuit, I "discern no reason why these constitutional notions of 'fairness' and 'reasonableness' . . . should be discarded completely when jurisdiction is asserted under a federal statute rather than a state long-arm statute." *BCCI Holdings*, 119 F.3d at 945.  Under such federal statutes, a defendant should be afforded the opportunity to demonstrate "'that his liberty interests actually have been infringed' . . . [or] that the exercise of jurisdiction in the chosen forum will 'make litigation so gravely difficult and inconvenient that [he] unfairly is at a severe disadvantage in comparison to his opponent.'"  *Peay*, 205 F.3d at 1212 (internal citations omitted).  Even Footnote 4 in the court's opinion recognizes that "it is inconvenient to the defendants" to appear in Ohio. Allowing the automatic exercise of personal jurisdiction over out-of-state defendants based solely on whether they have any contacts with the United States abrogates our duty to inquire into whether the inconvenience of the forum results in a constitutional deprivation of their rights.

I therefore disagree with the court's conclusion that "our previous holdings in *United Liberty Life Insurance, Co. v. Ryan*, 985 F.2d 1320 (6th Cir. 1993), and *Haile v. Henderson*

---

**CONCURRENCE**

---

RONALD LEE GILMAN, Circuit Judge, concurring. I concur in the judgment and in the reasoning of the court on the merits of the case, but write separately because I disagree with the court's opinion in Part II.A. regarding ERISA's nationwide service of process provision, 29 U.S.C. § 1132(e)(2). The court in effect holds that the statute confers unfettered personal jurisdiction over defendants such as the deSotos without regard to "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Rather, I believe that the test for personal jurisdiction adopted by the Tenth and Eleventh Circuits is more compelling and should apply to the case at hand. *See Peay v. BellSouth Medical Assistance Plan*, 205 F.3d 1206, 1212 (10th Cir. 2000) (finding that due process requires an inquiry into the fairness of requiring a defendant in a § 1132(e)(2) ERISA action to submit to a remote forum, rather than simply asking whether the defendant has minimum contacts with the United States); *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 946-48 (11th Cir. 1997) (engaging in a due process analysis regarding the fairness of requiring the defendant to be tried in a remote forum under a nationwide service of process provision in the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1965(d)).

Section 1132(e)(2) of ERISA provides for service of process in any district where a defendant resides or may be found. Although this provision acts as a *statutory* basis for personal jurisdiction, it cannot trump the *constitutional limits* of due process to acquire jurisdiction over a particular defendant. *See BCCI Holdings*, 119 F.3d at 942. The personal jurisdiction requirement stems from the Due Process Clause of the Fifth Amendment and serves to restrict judicial power in order to protect an individual's liberty interest. *See*

According to the deSotos, the court's decision to base the personal jurisdiction inquiry on national contacts rather than their contacts with the State of Ohio violated their Fifth Amendment due process rights. Citing *Peay v. Bellsouth Medical Assistance Plan*, 205 F.3d 1206, 1209 (10th Cir. 2000), and *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935 (11th Cir. 1997), for support, they urge us to adopt a two-part test when analyzing personal jurisdiction questions under § 1132(e)(2). Under their test, we would first determine whether the defendant has sufficient contacts with the United States and then determine whether the defendant has sufficient contacts with the forum state. If the answer to either question is no, then we would not have personal jurisdiction over the defendant. And because they demonstrated that they do not have sufficient contacts to the State of Ohio, they maintain, it was inappropriate for the court to exercise jurisdiction over them. In essence, then, the deSotos urge this court to hold that § 1132(e)(2) has no effect on the personal jurisdiction inquiry in ERISA cases. MMO responds that our previous holdings in *United Liberty Life Insurance Co. v. Ryan*, 985 F.2d 1320 (6th Cir. 1993), and *Haile v. Henderson National Bank*, 657 F.2d 816 (6th Cir. 1981), applying a national contacts test where the statute in question contained a national service of process provision, mandate that we apply such a test here.

We agree. In *United Liberty*, we held that the national service of process provision contained in § 78aa of the Securities Exchange Act of 1934 "confer[red] personal jurisdiction in any federal district court over any defendant with minimum contacts to the United States." *United Liberty*, 985 F.2d at 1330.[3] We based that holding on our rationale in

---

[3]The relevant provision of that statute reads,
Any suit . . . to enforce any liability or duty created by this chapter . . . may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process may be served in any other district of which the defendant is an inhabitant or wherever the defendant

*Haile*. In *Haile* we observed that the minimum contacts with the forum state analysis controls states' extra-territorial exercise of jurisdiction in order to protect the defendant's due process rights. Because of the national service of process provision, the district court's exercise of jurisdiction was not "extra-territorial but rather nationwide," and therefore, the "minimum contacts analysis, as a limitation on state extra-territorial power, [was] simply inapposite." *Haile* 657 F.2d at 826. Instead, in such cases we would apply a minimum contacts with the United States analysis. *See United Liberty*, 985 F.2d at 1330. Our holdings in *Haile* and *United Liberty*, and the rationale supporting them, apply equally to ERISA's national service of process provision. *See NGS American, Inc. v. Jefferson*, 218 F.3d 519, 524 n.5 (6th Cir. 2000) (stating that "the weight of Sixth Circuit precedent supports acceptance of the national contacts approach" and therefore we "would likely have to find personal jurisdiction in this case if NGS's action truly were brought under ERISA"). Consequently, we reaffirm our holding that Congress has the power to confer nationwide personal jurisdiction; and we hold that it conferred such jurisdiction under § 1132(e)(2) on the district court where the plan is administered.

In so holding, we reject the deSotos' assertion that the Supreme Court's language in *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982), invalidates the rationale for upholding nationwide jurisdiction provisions. In *Insurance Corp. of Ireland*, the Court rejected the notion that personal jurisdiction is based on federalism concerns, stating the "personal jurisdiction requirement recognizes and protects an individual liberty interest. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Id.* at 702. Contrary to the deSotos' assertion, our decision in *Haile* is consistent with the Court's statement in *Insurance*

---

may be found.
15 U.S.C. § 78aa.

---

U.S. at 60. Thus, it "changes the bargain between insurer and insured." *Ward*, 526 U.S. at 374. And in doing so, it defines the terms of the parties' relationship. *See Pilot Life,* 481 U.S. at 51. Finally, section 3333.1 is limited to the insurance industry because, as the California Supreme Court noted in *Western Steamship Lines, Inc.*, the law is part of an Act "calculated to reduce the cost of insurance by limiting the amount and timing of recovery in cases of professional negligence." *Western Steamship Lines, Inc.*, 876 P.2d at 1068. Therefore, "[i]t does not merely have an impact on the insurance industry; it is aimed at it." *FMC*, 498 U.S. at 61. Accordingly, section 3333.1 is not preempted by ERISA and governs the disposition of this case.

3. Applying Section 3333.1

While on its face section 3333.1 applies only when the parties proceeded to trial, California courts have interpreted the section as applying to settlements as well. *See Graham v. Workers' Compensation Appeals Bd.*, 258 Cal. Rptr. 376, 382 (Cal. Ct. App. 1989) (applying section 3333.1 in the context of a settlement because of the California Supreme Court's holding that "the practical effect of 3333.1 is to reduce the plaintiff's recovery in any medical malpractice case where the collateral source benefits are payable, regardless of whether the plaintiff obtains recovery in trial or otherwise"). In applying section 3333.1(b)'s mandate that "[n]o source of collateral benefits . . . shall recover any amount against the plaintiff," we conclude that it prohibits MMO from recovering medical expenses it paid on Mrs. deSoto's behalf. The district court erred in holding otherwise.

### III. CONCLUSION

For the foregoing reasons, we reverse the district court's judgments and remand with instructions for the district court to enter summary judgment in favor of the deSotos. Further, we vacate the district court's judgment awarding attorneys' fees in light of this opinion.

Our analysis of the McCarran-Ferguson Act criteria verifies our commonsense reading of section 3333.1. To meet the established criteria for interpreting the phrase "business of insurance" under the McCarran-Ferguson Act, a law must (1) have the effect of transferring or spreading a policyholder's risk, (2) be an integral part of the policy relationship between the insurer and the insured, and (3) be limited to entities within the insurance industry. *See Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 743 (1985). In the case of the savings clause analysis, however, the requirement is not as rigid. The Supreme Court in *Ward* made clear that all three factors need not be present. *Ward*, 526 U.S. at 373. It did not make clear, however, just how many need to be present or the relative weight of each.

We need not concern ourselves with the answers to those questions here because all the factors are present in this case. First, section 3333.1 has the effect of transferring or spreading risk. The logical effect of prohibiting medical malpractice victims from recovering medical expenses paid for by their insurance and preventing the insurance companies from recovering those costs from the victim, is to decrease the premiums of health care providers' insurance and increase the premiums of health insurance--i.e., spread risks. This conclusion is supported by California courts' assessment of section 3333.1's effect. According to California courts, one purpose of the statute "is to shift the cost of special damages for medical treatment from the malpractice insurance carriers to the providers of medical and hospital insurance." *California Physicians' Serv. v. Superior Court*, 162 Cal. Rptr. 266, 270 (Cal. Ct. App.1980); *accord Brame v. Wood*, 689 P.2d 446, 449 (Cal. 1984). Second, it is an integral part of the policy relationship between the insurer and the insured because it, like the Pennsylvania statute, "prohibits plans from being structured in a manner requiring reimbursement in the event of recovery from a third party. It requires plan providers to calculate benefit levels . . . based on expected liability conditions that differ from those in States that have not enacted similar antisubrogation legislation." *FMC*, 498

*Corp. of Ireland*. In *Haile*, we recognized that the personal jurisdiction requirement restricts judicial power as a matter of individual liberty--the individual's due process right not to be subject to extra-territorial jurisdiction unless he has a sufficient relationship with the state asserting jurisdiction. When, however, a federal court sitting pursuant to federal question jurisdiction exercises personal jurisdiction over a US citizen or resident based on a congressionally authorized nationwide service of process provision, that individual liberty interest is not threatened. In such cases, the individual is not being subject to extra-territorial jurisdiction, because the individual is within the territory of the sovereign--the United States--exercising jurisdiction. In other words, when a federal court exercises jurisdiction pursuant to a national service of process provision, it is exercising jurisdiction for the territory of the United States and the individual liberty concern is whether the individual over which the court is exercising jurisdiction has sufficient minimum contacts with the United States.[4] This reading of the Due Process Clause,

---

[4] Our conclusion is not universally adopted among the circuits though the majority of the circuits have held that national service of process provisions confer nationwide jurisdiction. *See Board of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Elitre Erectors, Inc.*, 212 F.3d 1031, 1035 (7th Cir. 2000) (applying a national contacts test based on § 1132(e)(2)'s nationwide service of process provision); *In re Fed. Fountain, Inc.*, 165 F.3d 600, 601 (8th Cir. 1999) (upholding Fed. R. Bankr. P. 7004(d)'s national service of process provision); *Bellaire Gen. Hosp. v. Blue Cross Blue Shield*, 97 F.3d 822, 825 (5th Cir. 1996) (holding that § 1132(e)(2) confers national jurisdiction over anyone having sufficient minimum contacts with the United States); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056-57 (2d Cir. 1993) (upholding 29 U.S.C. § 1451(d)'s national service of process provision as conferring nationwide jurisdiction).

The Tenth and Eleventh Circuits, however, have recently rejected this view. *See Peay*, 205 F.3d at 1210 (rejecting the argument that § 1132(e)(2) confers nationwide jurisdiction); *BCCI Holdings*, 119 F.3d at 943. Both of these cases are based on the belief that the national contacts test fails to protect the individual liberty interest in question. Even if we were to agree with the Tenth and Eleventh Circuits, we would find jurisdiction here. The ERISA statute gives notice that suits may be

in addition to being not inconsistent with the Court's statements in *Insurance Corp. of Ireland*, is supported by its more recent explanation of the Clause's effect. "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1984).

The deSotos do not dispute that they reside within the United States and thus have meaningful ties with the forum rendering the judgment. Accordingly, the district court's exercise of jurisdiction was proper.

### B. The Plan

On the merits, the district court, relying on ERISA common law, ruled that once the deSotos settled with the Regents, they were obligated to reimburse MMO for the medical expenses it paid on Mrs. deSoto's behalf. The deSotos argue that the district court's reading of the Certificate is flawed. They read the Certificate as requiring them to reimburse MMO for medical expenses it pays on Mrs. deSoto's behalf only after they receive an award for those expenses. And, they conclude, because in this case they received no such award, as the settlement agreement explicitly excluded medical

---

brought in the district where the ERISA plan is administered. There is nothing fundamentally unfair in permitting the plan, which is administered like a trust, to bring suits where it is located. While it is inconvenient to the defendants, it is convenient to the plan, reducing its costs, to the benefit of all plan beneficiaries. Congress has balanced the plan's interest and permitted suit where the plan is located. This does not seem to us unreasonable or unfair and meets the standards set forth in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 470-77 (1985) (stating that due process is satisfied when the "defendant's . . . connection with the forum state . . .[is] such that he should reasonably anticipate being haled into court there") (citations omitted).

---

*Ins. of America v. Ward,* 526 U.S. 358, 367 (1999). That reading should be "verified" by determining whether or to what extent the law meets the established criteria for interpreting the phrase "business of insurance" under the McCarran-Ferguson Act. *See id.* We believe section 3333.1 satisfies both tests.

We believe a reading of the section indicates that it regulates insurance. Subsection (a) allows a health care provider being sued for professional negligence to introduce evidence that the plaintiff obtained collateral benefits from its insurance company. And subsection (b) prohibits the source of those collateral benefits, insurance companies, from recovering the benefits it provided the plaintiff or subrogating the plaintiff's right to recover. By preventing any such recovery or subrogation, the terms of section 3333.1 govern the relationship between the insurer and the insured. As such, it is "specifically directed toward [the insurance] industry." *Pilot Life Ins. Co.*, 481 U.S. at 49. Supreme Court precedent supports our view. In *FMC*, the Supreme Court held that a common sense reading of a Pennsylvania antisubrogation statute, with language similar to that of section 3333.1, indicated that the statute regulated insurance.[12] "There is no dispute that the Pennsylvania law falls within ERISA's insurance saving clause . . . . Section 1720 directly controls the terms of insurance contracts by invalidating any subrogation provisions they contain. . . . It does not merely have an impact on the insurance industry; it is aimed at it." *FMC*, 498 U.S. at 61.

---

[12]The statute provided,

In actions arising out of the maintenance or use of a motor vehicle, there shall be no right of subrogation or reimbursement from a claimant's tort recovery with respect to workers' compensation benefits . . . .

*FMC*, 498 U.S. at 55 n.1 (quoting Motor Vehicle Financial Responsibility Act, 75 Pa.Cons.Stat. § 1720 (1987)).

2.  Whether ERISA Preempts Section 3333.1

Even if California law applies, MMO argues, § 1144(a) of ERISA preempts California Civil Code section 3333.1.  The district court agreed, finding, in a footnote, that the section was potentially preempted by § 1144(a) because it relates to an employee benefit plan and it was not saved by § 1144(b)'s savings clause because it does not "regulate insurance."

We disagree with the district court's conclusion that ERISA preempts section 3333.1.  In determining whether ERISA preempts section 3333.1, we must answer three questions: First, we must determine whether section 3333.1 relates to an employee benefit plan.  If it does, it would be preempted, *see* 29 U.S.C. § 1144(a), unless we answer the second question in the affirmative.  The second question we must answer is whether the state  law "regulates insurance." *See id.* at § 1144(b)(2)(A).  If section 3333.1 regulates insurance, it would be "saved" from preemption. *See id.*  Third, though it would be saved from preemption, section 3333.1 would not have any effect on the plan if MMO were not deemed an insurance company. *See id.* at § 1144(b)(2)(B); *FMC Corp. v. Holliday*, 498 U.S. 52, 61 (1990).  Under Supreme Court precedent, a self-funded plan may not be deemed an insurance company and therefore will be exempt from saved state laws. An insured plan, on the other hand, is deemed an insurance company and therefore is subject to the requirements of saved state laws. *See FMC,* 498 U.S. at 61.  The parties do not dispute that section 3333.1 relates to employee benefit plans and therefore is potentially preempted.  Nor do they dispute that the benefit plan is an insured plan and therefore not protected from state law by ERISA's "deemer clause."

Thus, the only question we must answer is whether section 3333.1 "regulates insurance."  Per Supreme Court guidance, a state law regulates insurance if a common sense meaning of the language of the statute indicates that it is "specifically directed toward [the insurance] industry." *Pilot Life Ins. Co. v. Dedeavux*, 481 U.S. 41, 49 (1987); *see also UNUM Life*

expenses, MMO cannot recover the medical expenses it paid on Mrs. deSoto's behalf.[5]

The deSotos cannot prevail on this argument because the settlement agreement does not in fact indicate the parties' intent (and actions) to exclude medical expenses from the settlement award.  Rather than simply stating that the award does not include medical expenses, the agreement states that the award constitutes "damages on account of personal injury within the meaning of Section 104(a)(2) of the Internal Revenue Code."  That statement simply does not get the job done.  The Supreme Court has stated in dicta that "medical expenses for injuries arising out of [an] accident clearly constitute damages received 'on account of personal injury,'" as defined by § 104(a)(2). *Commissioner v. Schleier*, 515 U.S. 323, 329 (1995).  Section 104(a)(2) does not explicitly exclude all medical expenses and the deSotos have not pointed to any authority to support their position.[6]  Therefore, we cannot say that the deSotos were not required to reimburse MMO because the settlement excluded medical expenses.

---

[5]MMO argues that the deSotos waived this argument because they did not raise it in the district court.  MMO is mistaken.  The deSotos argued in their Supplemental Brief in Support of Summary Judgment that they did not recover any medical expenses under the settlement and therefore MMO is not entitled to be reimbursed for the medical expenses. Though the argument is contained in a larger section discussing why the initial default judgment is not relevant to the outcome of their case, we believe it is sufficient to find that the deSotos raised the issue in the district court.

[6]Section 104(a) in conjunction with § 213(a) would exclude some medical expenses.  Section 104(a) excludes from its definition of amounts of damages received on account of personal injury, amounts "attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year."  26 U.S.C. § 104(a).  Section 213 deductions relate to "expenses paid during the taxable year, *not compensated for by insurance or otherwise.*" *Id.* at 213(a) (emphasis added).  MMO paid Mrs. deSoto's medical expenses; therefore, § 104(a)'s exclusion does not apply to their medical expenses.

### C. California Civil Code Section 3333.1

Even if that is the case, the deSotos argue, they are not obligated to reimburse MMO because California law governs the Certificate and section 3333.1(b) of California's Civil Code prohibits MMO from recovering the medical expenses from the deSotos.[7]   The district court disagreed with the deSotos' first proposition--that California law governs this case--holding instead that Ohio law applied but because Ohio did not have an antisubrogation statute, ERISA common law governed the case. Thus, before we can reach the question of the effect of section 3333.1 on MMO's right to recover, we must determine whether California or Ohio law applies and whether ERISA preempts that law.[8]

---

[7]Section 3333.1 provides,
(a) In the event the defendant so elects, in an action for personal injury against a health care provider based upon professional negligence, he may introduce evidence of any amount payable as a benefit to the plaintiff as a result of the personal injury pursuant to . . . any health, sickness or income-disability insurance, accident insurance that provides health benefits or income-disability coverage, and any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost of medical, hospital, dental, or other health care services. . . .
(b) No source of collateral benefits introduced in subsection (a) shall recover any amount against the plaintiff       nor shall it be subrogated to the rights of the plaintiff against the defendant.
CAL. CIV. CODE § 3333.1.

[8]At oral argument there was some discussion concerning the order of the preemption analysis--specifically, whether we begin by asking what law applies and then undertaking the preemption analysis or by asking whether ERISA potentially preempts state law; then determining which states' law applies; and finally conducting the second and third steps of the preemption analysis. Antisubrogation laws undoubtedly relate to ERISA plans and therefore any such law would be preempted. Thus, if both states had such a law, it would make little difference which question we asked first.   However, in this case only California has an antisubrogation law, so we ask first which states' law applies.

For similar reasons we are not persuaded that section 192 and comment h of the Restatement (Second) Conflicts of Law impel the application of Ohio law.  Comment h provides, "In the case of group life insurance, rights against the insurer are usually governed by the law which governs the master policy. . . . [Thus,] the rights of a particular employee against the insurer will usually be determined . . . at least as to most issues, not by the local law of the state where the employee has domiciled and received his certificate but rather by the law governing the master policy." Restatement (Second) of Conflicts of Law § 192 cmt. h.[11]   We believe that the comment is based upon situations where the master policy controls the rights of the insured, as generally the certificate issued to the insured is not a separate contract. *See Boseman*, 301 U.S. at 203.  Accordingly, it would have no operation here.

Were it to apply to this case, it would not alter our conclusion.   The comment refers to "rights against the insurer," but here, the question is the rights of the insurer against the insured--whether MMO has the right to recover medical expenses from the deSotos' settlement award. Consequently, it is not entirely clear that comment h would govern suits by the insurer against the insured.  The text of section 192, moreover, references section 6, intimating that the determinative issue is still which state has the most significant relationship with the contract.  That state, as we have already determined, is California.   Hence, it is California's law, and in particular section 3333.1 of the California Civil Code, that applies to the Certificate.

---

[11]Comment l indicates that comment h applies equally to "noncancellable disability insurance contracts"--that is, contracts "which the insured has the option of continuing up to a stated age by timely payment of premiums." Restatement (Second) of Conflicts of Law § 192 cmt. l.

In the view of the Legislature, 'the rising costs of medical malpractice insurance was imposing serious problems for the health care system in California, threatening to curtail the availability of medical care in some parts of the state and creating the very real possibility that many doctors would practice without insurance, leaving patients who might be injured by such doctors with the prospect of uncollectible judgments.' . . . The continuing availability of adequate medical care depends directly on the availability of adequate insurance coverage, which in turn operates as a function of costs associated with medical malpractice litigation. . . . Accordingly, MICRA includes a variety provisions all of which are calculated to reduce the cost of insurance by limiting the amount and timing of recovery in cases of professional negligence.

*Id.* (internal citations omitted). Mrs. deSoto's settlement with the Regents was guided by this policy--while the settlement failed to articulate that it was excluding medical expenses from the award, it seems clear that the parties' intent was such and the default judgment entered by the California court was decreased to reflect that intent. Ohio does not appear to have a competing interest in having its law applied. Nor do we see any other policy that favors applying Ohio law.

One could argue that our decision to apply California law rather than applying the law of the state governing the group policy, Ohio, cuts against the "certainty, predictability and uniformity of result" principle contained in the Restatement. In seeking reimbursement for benefits provided, a group insurance company would have to contend with the laws of several states rather than just the law of the state which governs the master policy, the argument would go. Such an argument, however, would overlook the unique circumstances of this case. If this suit were premised upon the contract between MMO and Janik & Dunn--that is, the master policy--as is generally the case, *see* 1 RUSS, COUCH ON INSURANCE §§ 7:1, 8:7, we might well reach a different conclusion.

1. Which States' Law Applies

In determining which states' law applies, our analysis is governed by the choice of law principles derived from federal common law. *See Brotherhood of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 201 F.3d 18, 25-26 (2d Cir. 2000); *see also Bickel v. Korean Air Lines Co.*, 83 F.3d 127, 130 (6th Cir.), *vacated in part by Bickel v. Korean Air Lines Co.*, 96 F.3d 151 (6th Cir. 1996); *Enterprise Group Planning, Inc. v. Falba,* No. 94-3827, 1995 WL 764117 at *2 (6th Cir. 1995).[9]

"In the absence of any established body of federal choice of law rules, we begin with the Restatement (Second) of Conflicts of Law," *Bickel*, 83 F.3d at 130, in particular section 188. That section provides,

(1)  The rights and duties of the parties with respect to an issue in a contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2)  In the absence of an effective choice of law by the parties . . . the contacts to be taken into account in applying the principles of § 6 to determine the applicable law to an issue include:
   (a) the place of contracting,
   (b) the place of negotiation of the contract,
   (c) the place of performance,

---

[9]The Tenth Circuit has recently applied the forum state's choice of law doctrine in analyzing which states' substantive law applied in an ERISA action. *See Dang v. UNUM Life Ins. Co. of America*, 175 F.3d 1186, 1190 (10th Cir. 1999). Under the Tenth Circuit's rule, we would apply Ohio choice of law doctrine, as Ohio is the forum state. Such an analysis would reach the same result we reach using federal common law principles because Ohio has adopted the Restatement's choice of law principles as well. *See International Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 604 (6th Cir. 1996).

(d) the location of the subject matter of the contract, and
(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

Restatement (Second) of Conflicts of Law § 188 (1971). The principles underlying these factors are set forth in section 6 of the Restatement. Those principles are:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

*Id.* at § 6. Based upon the factors enumerated in section 188, the district court determined that Ohio law applied to the plan. In applying these factors, the district court assumed the relevant contract was between MMO and Janik & Dunn. It is not. While the Master Policy between the insurer and the employer may generally be the controlling document, *see* 1 LEE R. RUSS, COUCH ON INSURANCE §§ 7:1, 8:7 (3d ed. 1997), that is not the case here. MMO's brief argues that the relationship between MMO and Mrs. deSoto is governed by the Certificate. Therefore, it is the relevant contract.[10]

---

[10] We recognize that the Supreme Court in *Boseman v. Connecticut General Life Ins. Co.*, 301 U.S. 196 (1937), found that the certificate at issue was not a separate contract; however, we think this case factually distinguishable. There the certificate was not among the documents declared to constitute the entire contract of insurance. *See id.* at 203. Here the Certificate in effect during the time of the settlement between the Regents and Mrs. deSoto declared that it was among the documents

"Turning to the application of the factors set forth in section 6 of the Restatement, we note that, even when sections 6 and 188 are read together, it is clear they only provide a broad general framework for the resolution of choice of law issues . . . ." *International Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 606 (6th Cir. 1996). Indeed, "[w]ithin that framework, a judge must balance principles, policies, factors, weights, and emphases to reach a result, the derivation of which, in all honesty, does not proceed with mathematical precision." *Id.* Applying that framework to the Certificate, we conclude that California law applies. If the factors in section 188 militate toward either state, it is toward California law. The record does not reveal the place of contracting. However, the place of performance--where MMO provided benefits to Mrs. deSoto and where Mrs. deSoto took steps to receive those benefits--was California. The subject matter of the contract--Mrs. deSoto's medical expenses--was incurred in California. And while MMO is an Ohio corporation, Mrs. deSoto is a resident of California.

More important to our decision is the policy interest California has in its law applying. *See id.* at 608-09 (Ryan, J., concurring); Restatement (Second) Conflicts of Law § 188 cmt. f ("In general, it is fitting that the state whose interests are most deeply affected should have its local law applied."). California enacted the Medical Injury Compensation Reform Act, 1975 Cal. Stat., Second Ex. Sess. 1975-1976, chs. 1, 2, at 3949-4007, codified in part in Civil Code section 3333.1, in an effort to limit the liability of health care providers, thereby alleviating the burden on their insurance companies. *See Western Steamship Lines, Inc. v. San Pedro Peninsula Hosp.*, 876 P.2d 1062, 1068 (Cal. 1994). As the California Supreme Court noted,

---

constituting the entire contract of insurance. There the certificate served merely as evidence of the insurance of the employee. *See id.* Here, MMO's appellate brief states that the Certificate is the contract of insurance.